Good morning. Good morning, Your Honor. Richard Rothschild, Western Center on Law and Poverty for the Plaintiffs and Appellants. I'd like to reserve three minutes for rebuttal. Certainly. As the Supreme Court and this Court have repeatedly said, it's a virtually unflagging obligation for a federal court to exercise its jurisdiction. And as the courts have also said, that obligation is particularly weighty when here, as here, a suit is brought under 42 U.S.C. section 1983. The various abstention doctrines, including the one invoked in this case, are supposed to provide a narrow exception to that rule. But if the Superior Court's arguments were upheld in this case, the exception would swallow the rule entirely when the defendants are state court officials sued in their administrative capacity. Remind me what your constitutional argument is. We had six or seven causes of action. I think one of them was for First Amendment and the right to petition the government. Most of our arguments are statutory. ADA and Fair Housing Act. The Fair Housing Act was not part of the temporary restraining order, but it is part of the case. The abstention doctrine invoked in this case was announced first in Younger v. Harris and expanded upon in the O'Shea case. It prevents a federal court from interfering with the judicative function, the judicial function of courts, not the administrative function. Thus, in the O'Shea case itself, for example, the plaintiffs sued two state court judicial officers and said that their decisions on bail and sentencing were racially discriminatory. In order to determine that, the courts would have to be preventing future decisions by these judges. They'd have to be examining these judges' bail and sentencing decisions one by one, and the O'Shea courts said that went too far. More recently, in the E.T. case, the plaintiffs sued a Superior Court and said the dependency court attorneys were underfunded. Basically, are you asking a district court judge here to decide whether the county should have closed ten fewer courts or moved four from here and four from there and needs to shift judges from one side of the county to the other and that sort of thing? We're arguing that the particular plan is so egregious that it violates the ADA. The court will have to come up with a different plan, and that would have to be... anytime you sue a state official, whether the official works for the executive branch or the judicial branch, the courts can't really dictate the precise relief. It's more... But in some sense, you're asking for that precise relief, though, because the prayer for relief in the complaint, it's all injunctive relief to prevent these courthouses from being closed to unlawful detainer. The problem I have with this case is that in looking at the type of relief and the retention of jurisdiction that you're asking for, really the federal court would have to sit as an auditor and intrude into the state court's decisions as to where to cut in times of limited resources. And so over the course of half a dozen years or so, the LA Superior Court has had to cut service after service after service, and the judges don't like it, the administrators don't like it either. But with budget cuts, you've got to cut somewhere. And so are you essentially asking the federal court to be involved and tell the state courts where they need to cut? Because closing one courthouse, let's say reopening one courthouse, means that you're probably going to have to close another courthouse. Should we get into those sort of decisions? To a limited extent, yes, Your Honor. To the extent that the decision that the court... And these are really difficult questions, but they're difficult questions that go to the remedy, that go to the merits of the litigation. We never got to argue the merits of the litigation. What you said is true is also true for the case that we cited in our Rule 28J letter, the courthouse news services versus planning. In that case, the Superior Court, represented by the same counsel, made the same argument, that if we're going to give reporters same-day news service, then you're going to have to cut something else. And this court said that's not an issue at the abstention level. And it's really an issue anytime state officials are sued and the relief might involve money, it's a problem. But it's not a problem at the abstention level. It's a problem when you get to the relief. And particularly, it's also not an interference with the adjudicative function. If there's going to be an abstention doctrine that says anytime you interfere with the administrative function of a state court, that should be a doctrine announced by the United States Supreme Court. It hasn't, not in the first, not by... I agree with you. It's not adjudicative in the sense that we don't necessarily have to look to the underlying merits of individual cases. But there's still really serious core federalism concerns when you have to monitor and assess the compliance of the state court in terms of which services are being cut and which services are being offered. Now, there are a number of organizational plaintiffs in this case. And obviously, each organization has its own clientele. If an injunction were to be issued and let's say the Chatsworth Courthouse is not reopened but some other courthouse that's closer to one of the individual clients become available, then would other individuals, clients of these organizations come forward and say, well, now I'm driving 10 miles and so the individual plaintiff in this particular case may have the relief, but what about me? And then would the federal court then have to, as part of this monitoring of the injunction, make that determination? Well, how far do you live in the local courthouse? What are your impediments? And get into those kind of questions. The ADA, as many other statutes, requires a certain amount of line drawing. It's not unique and I don't think it doesn't make this case unique. The court would have to decide that this particular plan requires people with disabilities to drive, not drive, but to get into public transportation and take five-hour round trips just to be able to answer the complaint and then 20 days later to get to the trial, that this plan, taken as a whole, violates the ADA. I understand that the Van Nuys Courthouse is now open to UD cases as well as Norwalk, correct? That is correct, Your Honor. And given that both Ms. Miles and Plaintiff Sullivan live out in the valley, does that move their individual cases, leaving only the organizational plaintiffs in this case? Well, Your Honor, their individual unlawful detainer cases, since this case was filed two years ago, have been resolved. But this is not a case like, this is a case that could happen again to them. It's not like the Lyons v. City of Los Angeles case where it seemed very unlikely that the plaintiff was going to be subjected to a chokehold. Even if it is capable of repetition, yet even review type of argument that you're raising, the fact that there is now a UD courtroom in Van Nuys closer to their residence, does that mean that there's no, there's redressability problems as to these individual plaintiffs? I'd have to, to be honest, Your Honor, I'm not sure exactly if they're still living in the same place. But if it is true that there might be problems with the mootness of these individual plaintiffs, it certainly doesn't moot out the four organizational plaintiffs. Right, and the reason I asked you that is that if the individual plaintiffs somehow can no longer move forward with their cases, there may be some Article III standing issues with the organizations that we'd have to look at those issues again. So my question is really the impact of the reopening of the Norwalk and Van Nuys courthouses to unlawful detainer actions and what impact that might have on the Article III standing issues in this case. It might or might not have some impact on the individual plaintiffs. I'd have to look into it. I can't imagine how it would have an impact on the organizational plaintiffs. And they've alleged, at least for the pleading levels, harms that would qualify under this court's jurisdiction for organizational standing. And in the standing, the standing decisions all seem to say that, well, there's Plaintiff A, Plaintiff B, and Plaintiff C. Plaintiff A has standing. We're not going to go any further. So does that answer your question? Counsel. Go ahead. Counsel, a slightly different question. Wouldn't the court have to decide these individual by individual? It's a little bit of what's coming up already. But what I'm wondering is, is your argument that let's say they're, hypothetically, there are three people with such a serious disability in Area A. Let's stipulate there are only three. The court then has to keep the whole courthouse open at all times for those three people? Or if anybody were putting in a plan, would they have to say, look, we're going to have a system, and you're going to have to show us that you come under the system? Do you see what I'm saying? It seems to me like it's a case-by-case situation. I mean a person-by-person situation, isn't it? No, under the ADA, the system would have to be looked at as a whole. And so you're saying that if there are three disabled people today, you have to keep a courthouse open five days a week to hear their unlawful detainer case in case that one person decides to come? Or could you have itinerant justices, judges that come around when you've got five cases to hear? You send a judge out to hear it, in which case wouldn't you have to say person-by-person whether this person's entitled to that? See, I'm assuming that not all people with disabilities can't drive or travel, and not all poor people can't drive or travel. I'm guessing that's true. I don't know. I don't have a record, obviously. Your Honor is asking good questions, but they really go to the merits. And on the merits, the ADA says services and programs have to be accessible. You look at it as a whole, and a public entity is not required to do things that would require an undue administrative or fiscal burden. Which would suggest that you do it person-by-person. No, it doesn't suggest that, Your Honor. It suggests that the system as a whole has to be looked at as whether it violates the ADA. And again, going back to your hypothetical, you have to keep every court open at all times for every single person. I think the defendants at that point would make an extremely good argument that that's an undue fiscal or administrative burden, and that's an argument that needs to be made when we get back to the district court and we get to litigate the case on the merits. Right. But I think the problem, what O'Shea tells us in the subsequent cases following O'Shea, is that to some extent you kind of have to test the allegations or assess the allegations and assess the relief asked in order to determine the level of intrusiveness that's really required. And so I share Judge Fernandez's concern that an organizational plaintiff may have a client that lives closer to a courthouse that is closed but yet have greater physical impediments, therefore affecting that particular individual's access to the courthouse more so than another disabled person who lives even farther. And so do we then get into that individual assessment in determining whether the state's complied with the injunctive relief that's being sought? I have two answers to that question, Your Honor. To the extent it goes to the merits of the ADA claim, I would look to cases like Crowder, where Crowder was a case where Hawaii demanded that dogs be quarantined for months and months, and the court held that it violated the rights of people with blind people to bring in their guide dogs. And it was pointed out in this case that not every person used a guide dog, and maybe there were some people who could have lived with the quarantine provisions, but still the court looked at it, judging it as a whole. But I think maybe the more important answer to your question is that, unlike in O'Shea and E.T., this doesn't appear with the judicial function. All the harm takes place outside the courtroom door. In fact, the harm is that the clients can't get to the courtroom door. I understand your argument. You're over time, but I'll give you some time for rebuttal. Let's hear from defendants, appellees in this case. Good morning. Good morning. May it please the court, my name is Robert Nave on behalf of the appellees. I had, I think, three related points that I wanted to address, and if you would like I can address the standing questions at least briefly. But if I can, I always try to back up in these cases when you get to oral argument, and try to figure out what's really going on in a case like this. And I think the easiest way to look at this case is to address the question that two of the panel members have already asked, which is isn't this a case-by-case determination. In our briefs, we've cited Weinrich and some other cases that spell out the elements of a claim for relief for violation of Title II of the ADA. The first one is the plaintiff has to be a qualified individual. But this proceeding doesn't consider whether the complaint is valid under Rule 12. This proceeding today simply addresses whether any of that can be heard by a federal judicial officer. Correct, Your Honor, I agree. So the second element is that the plaintiffs have made a claim that they have been denied access to a program or service or benefit provided by the court. So the reason that you need to focus on the elements of the cause of action is unless you look at those, you then can't make the required determination that O'Shea, E.T., and all these other cases require to say, okay, to decide that, how much interference is there with the judicial system? Is this a case-by-case determination? Are you interfering with the administrative justice? So respectfully, Your Honor, I think you do need to look at the elements. So the second element, you have to show that there has been a denial or interference with the program. This court's definition of program is the thing that the court does. There's a case called Daubert v. Lindsay Unified School District, which talks about what's a program, and they use the definition from the DOJ's regs. But you look at the program, and you ask, have you been discriminated against? Well, what's the program here? It's the court. It is, but it's not traveling to the court. So the question in this case is, understanding that no one is happy with these closures, what happens in the courtroom with respect to administration of justice? The claim, the only arguable claim here, is that because you closed down this court and you closed down that court and people might have to travel farther, that defaults will be entered against disabled litigants. The gist of the claim is that a population of disabled citizens can't get to court as a consequence of where the courts have been located under this plan. With respect on that issue, Your Honor, sometimes that might be true. Sometimes that might not be true. And the same thing was true with E.T. In E.T., the question was, do these attorneys have enough time to spend with their clients and represent them in dependency proceedings? And this court said, you know what? The only way we can determine that is to, use the magic phrase, audit the cases, watch over them, look to see what happened. Similarly in this case, the court would have to look at individual U.D. cases and have to ask, was a disabled person involved? First element of the cause of action. Were they denied a benefit somehow? Was there a default, which is the theory that the plaintiffs, I guess, are addressing in their complaint? Unscrupulous landlords was the other one that's mentioned in the complaint. Was there something about the change in the configuration of the courts that resulted in a denial of access to the program, i.e., the loss of justice? It moved the courts miles away. It seems self-evident that that could impact the ability of disabled citizens to get there. At the end of the day, a judge might say, I'm not going to give you an injunction. I'm not going to certify a class. A judge might say, the relief that you're seeking requires too great an intrusion into state court operations. It violates comedy. It violates federalism. But all these considerations are post-abstention. Here, no judicial officer has ever, if abstention is the rule, will get to consider any of these things. They may not get any injunction. They may have a complaint dismissed on 12B. They may lose on standing. A judge might say, I'm not issuing an injunction. I understand, Your Honor, and we've cited in our brief the cases, I think, from the 11th and the 5th Circuit. I believe those are all cited in E.T. with approval. They stand for the proposition that it is one of your responsibilities when you're determining whether or not O'Shea abstention applies is to do this precise type of predictive evaluation of what the claim for relief is and what its effect will be on the administration of justice. So in this case, number one, you'd have to audit the cases to see whether or not there has been a denial of access to the program, the default issue. The second is, if you look at the prayer for relief, essentially they want to, the prayer for relief ultimately enjoins the entire administration of the Los Angeles Superior Court because you can't pull out a string. I want to take this case. One of the panel members asked, well, what does that do to everything else? Well, we've all seen lots of prayers for relief and complaints that kind of didn't go anywhere. Excuse me, Your Honor? We've all seen lots of prayers for relief that didn't get relief. Again, though, Your Honor, the point of an abstention analysis is to look at what will the possible results be and to be predictive about what those will be and what does the proof require. And does it, one, does it require an audit of these cases? Clearly it does. Number two, does it interfere with the administration of justice of the cases itself? Yes, because they're essentially enjoining the entire system. And third, to the extent that those weren't enough, does the relief requested set the court up or the defendant up for further supervision by a federal court? And the answer to that is yes. Those are the three evils that O'Shea, E.T., and even, frankly, Courthouse News all recognize is why the court should abstain when dealing with these cases and essentially having a federal court dictate to a state court how to run its courthouse. So, yes, I understand that in the end, is the fact that they may not win, that there may be a defense judgment, does that mean that the court doesn't abstain? No. What that means is you've allowed the exact interference that O'Shea is trying to avoid, and then the result was that plants didn't win. That's why you have to look at the beginning of the case and do this predictive analysis that I've discussed. What impact, if any, does the reopening of Van Nuys and Norwalk have? First, I will note that your research found that. We hadn't disclosed that, Your Honor, and I just found out about that when we were preparing for these oral arguments, so that was something we were going to raise anyway.  I'll put it back. We still have severe financial disadvantage. So even with the opening of these two more hub courthouses for unlawful detainer cases, we still happen to open up other courtrooms, and other programs are affected as well. We still, for example, don't have court reporters in civil cases. So, point one, the court is still operating in sort of very serious financial concerns. With respect to the, I guess, standing issues, I don't know that, by itself, the opening up of these courthouses would create a barrier for this court to hear the case. You'd have to then ask the question, how does that impact these plaintiffs? How does that impact these organizational defendants? And I don't think that there's enough in the record for the court to make that determination. If the court were to go on that ground, I think it would have to send the case back. But, as I say, I think this is an abstention case start to finish under ET, so I don't think you'd go there. I did, though, want to make a point for the panel that we reserved in one of our footnotes this whole issue of standing. Under Hunt v. Washington State's Apple, you all know that test, one of the elements of associational standing is that if the lawsuit to proceed requires the presence of the individual members of the organization, then the organization doesn't, shouldn't have standing. That's how you deny standing for organizations. So we have questions about that. We were at the TRO stage, and we had, I think, a day to get our papers together. And so the record before this court, we reserved those issues, and that was all. But I can't say on the basis of this record that we have presented enough for the district court or for this court to definitively rule as a matter of law that there is no standing. We certainly reserved the right to litigate the issue if the case went back. But again, I don't think the case should be going back anyway. Unless the court has any further questions, our view of this is that this is E.T. start to finish. They are so close. I hate to say all fours, because you know I find some way that they're different. But they're very, very close. In both cases, there's a claimed violation of some kind of a right that affects how proceedings go in state court. Dependency cases in E.T. How does this affect how cases go in state court? It seems to me that it only affects where they're held. In other words, this case doesn't really get us inside the courthouse door. Again, Your Honor, the claim that is being asserted here is that because the courts are separated and there's too much of a distance between them, that defaults will be taking place inside those courthouses. So the audit that E.T. and O'Shea talks about is that you have to look at the individual cases inside the courthouse door. Well, the claim is also that you can't get to the courthouse. But what's the harm, Your Honor? With respect. I mean, we've said that in our briefs too. If the issue were, and we cited Jenkins and Allen on those cases, the sort of the big picture Article III cases, all those stand for the general proposition that, gosh, I've got this concern. Okay. If in the absence of an injury, Article III injury, your general concern that everybody shares, which, by the way, everybody shares in this case, that goes to the legislature. The only thing that Article III courts worry about is that concern that manifests in an injury. The injury in this case doesn't happen on the freeway. The injury in this case, if you believe the complaint, happens inside the courthouse when someone is allegedly defaulted because they can't get there because of a disability. That's why it's inside the courthouse. That is what you would have to determine, what a district court would have to determine. That's the forbidden audit. Suppose the program was that these courts were only open between 10 and 12 every day. And? And disabled people can't get to court between 10 and 12. I suppose you would go through that same analysis, Your Honor, to ask whether or not those... If the claim is that you were denying access to the program on the basis of disability by keeping the court open from 9 to 10, you'd still have to look at what happens in those proceedings. You'd still have to say, Do the people get there? You'd have to know what the circumstances are on a case-by-case basis. Well, but you can stop short of the courtroom doors. You can say, Okay, let's look at the impact in terms of their access. You don't have to delve into the merits, the adjudication of the cases to figure out, well, was the default caused? I mean, maybe the person made it and the default wasn't entered, but the burden is so great that it may still be a violation of a federal right. With respect, I don't think that's the law. If you look at the elements of a Title II claim, for sure they are not. If you look at the claim under Section 504, which you've also cited in the papers, I forget the name, Alexander v. Choate, meaningful access. It's all about meaningful access, and meaningful access, with respect, is if the program is dispensation of justice, UD cases, whatever the cases are, did you get that? Respectfully, you have to look at it. Now, I get it. The courthouse is open from one second to the next, and you didn't get there in time, so you get a judgment against you. I understand that, but that's not this case. This case is people have to travel more, and everyone understands that that's a problem. In the Central District, for Pete's sakes, people travel from Santa Barbara to appear in the Central District Federal Court. So the idea of travel... Suppose hypothetically the plan to save money was that in all of these courts, the elevators would shut down. The problem with that, Your Honor, is that comes under a separate section of the ADA. There are rules about program access, and there are rules about program access affected by facilities. So I understand what you're trying to get to, but that's not a good example because there are separate rules. That's what I could think of. I apologize, Your Honor. So to answer the question, that's Tennessee and Lane, right? There are rules that say for any building, including courthouses, thou shalt have. And what does that have to do with administration of the court? Well, nothing, because there's a rule that says you have to have an elevator, you can't have steps, you have to have a ramp. So you don't have to go, as we put it, inside the courtroom to ask, are the steps there? Do you comply with, they're called the Americans with Disabilities Act architectural guidelines. But that doesn't require you to audit a case because the violation in that case does occur outside. But there is no guideline, no rule, no nothing that says under the ADA or any of these statutes that a courthouse has to be placed 50 miles from the next one. If that were the case, my goodness, we'd all be in, I mean, the judiciary would be in a world of hurt. That's why the harm here, and I keep going back to the harm, because that's what the court has to focus on when trying to decide abstention analysis. The harm is what happens inside. We'll be defaulted, unscrupulous landlords are going to go after us. Please stop all this so we don't suffer that harm. That's the point of this lawsuit. All right, thank you very much. Thank you, Your Honor. Your Honor, answering your question on standing, my co-counsel has looked at the record, which she knows better than I do. And on pages 44 and 48 of our excerpts of record, it turns out both plaintiffs live in Chatsworth. Chatsworth, residents of Chatsworth have to travel a long distance to get to Chatsworth. They have to travel to Pasadena, 30 and 26 miles, respectively, for the two plaintiffs. They still have individual standing. What about his argument that you can't adjudicate this case without looking at the merits of the individual claims? I just disagree with that argument. Why, though? Because all our clients are asking for is access to the courts to be able to get into the courtroom. You don't look at whether they win the case, lose the case, or settle the case. As plaintiffs' attorneys, we'd prefer they win or favorably settle their cases, but that's not what this case is about. It's about them being able to get to the courtroom. And since we've had weeks to think of our own hypotheticals, Your Honor, ours is what if they put the one courtroom on top of a mountaintop? Under the Superior Court's argument, tough. Maybe we'll come up with an accommodation. But it's not just that it wouldn't violate the ADA, but what they're saying is we're not even going to let a judge look at whether it violates the ADA. What we're asking for might cause some restructuring of the courts, but that was true in the Los Angeles County Bar Association case as well. That's what Judge Candland's opinion, refusing to abstain, said. He said, yes, there may be some restructuring, but all you'll have to look at, you don't have to look at the substance of individual cases, all you have to look at in that case was average delay time. At most in our case, all you'd have to look at is how many more people are getting defaulted, not what happens once they get in the courtroom, not whether they're representing themselves well to make a parallel to O'Shea, not whether the judges are being unfair to them to make a parallel. The first one was a parallel to E.T. The second one was a parallel to O'Shea. It's not interference causing more money to be spent on administration, maybe a defense to ADA. It's not a reason to abstain. Thank you, counsel. We've got your arguments in hand, very interesting issues and well-argued by both sides, so we thank you for that.
judges: Fernandez, Parker, Nguyen